NOT DESIGNATED FOR PUBLICATION

No. 126,749

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

BRADLEY A. PISTOTNIK,
*Appellee*,

v.

BRIAN D. PISTOTNIK, BRIAN COLLIGNON,
and PISTOTNIK LAW OFFICES, LLC,
*Appellants*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; DEBORAH MITCHELL, judge. Oral argument held January 7, 2025. Opinion filed March 14, 2025. Affirmed.

*Brian D. Pistotnik*, *Brian R. Collignon*, and *John P. Pistotnik*, of Pistotnik Law Office, LLC, of Wichita, appellants pro se.

*Nathan R. Elliott*, *Donald N. Peterson*, and *N. Russell Hazlewood*, of Graybill & Hazlewood, LLC, of Wichita, for appellee.

Before GARDNER, P.J., MALONE and COBLE, JJ.

PER CURIAM: After a contentious dissolution of the law firm of the Affiliated Attorneys of Pistotnik Law Offices (AAPLO), including a lawsuit to accomplish its split, Brad Pistotnik (Brad) entered into a settlement agreement with the receiver for AAPLO; Brian Pistotnik (Brian); Brian Collignon (Collignon); and Brian and Collignon's new law firm, Pistotnik Law Offices, LLC (PLO). In August 2022, Brad filed a petition requesting specific performance of the settlement agreement after seeing a commercial with the former AAPLO's website used. After a bench trial, the district court ruled in Brad's favor.

1

Brian, Collignon, and PLO now appeal, raising multiple issues, which essentially boil down to Brian wanting his firm to continue using the email addresses containing what was AAPLO's domain name. Brad challenges this court's jurisdiction, arguing that Brian acquiesced to the district court's judgment.

After reviewing the record, we find Brian's potential acquiescence does not bar our consideration of this appeal. However, the appellants' claims fail on the merits. Brian and PLO could have raised claims regarding the settlement agreement's validity during the prior litigation, but did not, and the claims are now barred in this litigation by res judicata. And although Collignon's similar claims are not barred, they are unpersuasive.

Additionally, Brian's equitable estoppel argument regarding use of the domain name fails to show that Brad had a duty to speak or that he was induced by Brad's silence on his use of the domain name. Likewise, although Brian's equitable estoppel argument regarding the email address establishes that Brad may have had a duty to speak about the email addresses, Brian fails to show prejudice resulting from Brad's silence, and we find no abuse of discretion in the district court's decision.

FACTUAL AND PROCEDURAL BACKGROUND

*AAPLO Receivership and Settlement Agreement*

AAPLO was a law firm owned 50/50 by Brad and Brian. In 2014, after Brad left the firm, he filed an action to dissolve AAPLO. Subsequently, AAPLO was liquidated and the district court appointed a receiver to wind down the firm's affairs under K.S.A. 17-6808, which outlines the appointment and powers of receivers. Brad then formed a new law firm, Brad Pistotnik Law, P.A., of which Brad was the shareholder. Brian and Collignon both became members of PLO.

2

After the parties filed motions for temporary injunction in the dissolution action, the district court issued an order, in relevant part directing the parties' disputed use of AAPLO's internet domain name, "pistotniklaw.com." Under this order, because Brad had controlled the pistotniklaw.com website the month prior, Brian would control the website for an equal period. At the end of Brian's period of control, which would have occurred in mid-August 2014, the court ordered the website to "be reconfigured so that it simply contains links to Brad Pistotnik's website and to whatever website Brian Pistotnik wishes to create."

In July 2015, the parties to the receivership—Brad, Brian, Collignon, Pistotnik Law Offices, LLC (Brian's new firm, signed by Brian and Collignon as members), Brad Pistotnik, P.A. (Brad's new firm, signed by Brad as member), and David Rapp (as Receiver)—negotiated a settlement agreement containing, among other items, the following terms:

> "8. **CLOSING OF THE RECEIVERSHIP.** The Receivership shall be closed as soon as practicable. It is understood that a suit has recently been filed in which the RECEIVER has been named as a defendant, which may require some action by the RECEIVER.
>
> . . . .
>
> "28. **DOMAIN NAMES.** BRAD PISTOTNIK agrees that the domain name pistotnik.com shall not be used in connection with legal services. BRIAN PISTOTNIK agrees that the domain name pistotniklaw.com shall be removed from the internet and killed, and the parties agree that nobody will use any of the content from that website in the future for any purpose."

At the time of the settlement agreement, AAPLO and Brad had filed an attorney's lien for recovery of fees in a case referred to as "the Consolver Action" (Consolver). The suit naming the receiver as a defendant—referenced in paragraph 8 of the settlement

agreement—was a counterclaim by Consolver against Brad. That counterclaim was later dismissed.

Later in 2015, Brad filed a motion asking the court to require Brian to sign the settlement agreement, to order Brian "to deal with the domain name, pistotniklaw.com, in accordance with the settlement agreement," and "to execute a journal entry of dismissal of prejudice of the claims that the parties had against each other[.]"

Brian also filed a motion to enforce the settlement agreement and to terminate the receivership. At that time, Brad and the receiver believed the receivership had to remain open to handle AAPLO's 2015 taxes and the Consolver lawsuit. Brian claimed those matters did not require the receiver's involvement since the parties "expressly understood" they would handle the taxes without the receiver's involvement and Consolver never served AAPLO in her suit against Brad.

The district court granted Brad's request to require Brian to sign the settlement agreement, which he did by signing and signifying his objection that he was signing involuntarily and under duress, next to his signature. The court dismissed the claims the parties had against each other and ruled that the "action shall remain open until the Receiver . . . winds up the affairs of [AAPLO], and provides his final report to the Court."

Brian filed a subsequent motion to terminate the receivership, which the district court denied in March 2016. The court concluded the receivership had to remain open to complete AAPLO's 2015 and 2016 taxes. The court stated: "Once the 2016 taxes are paid, it is the Court's intention to close the receivership." Brian appealed the ruling, claiming the district court erred in refusing to close the receivership. Another panel of this court affirmed the district court's ruling, noting that closure of a receivership is left to

the district court's discretion. *Pistotnik v. Pistotnik*, No. 115,715, 2017 WL 2210776, at *6 (Kan. App. 2017) (unpublished opinion) (*Pistotnik I*).

In July 2020, the district court entered an order terminating the receivership. In its order, the court found "there is no motion nor request before this Court to set aside that 2015 settlement agreement or to find that it is invalid."

*Brad's Action for Breach of Settlement Agreement*

In February 2022, PLO aired a TV commercial containing the pistotniklaw.com domain. Following its airing, Brad sent a "cease and desist" text message to Collignon. Brad's counsel also sent a "cease and desist" letter, claiming Brian breached the settlement agreement by using the pistotniklaw.com domain name in TV ads and by, assumedly, reactivating the domain name to redirect traffic from the pistotniklaw.com website to PLO's website, pistotniklawfirm.com.

In August 2022, Brad filed a petition alleging breach of the settlement agreement. Brad requested specific performance of the settlement agreement or "an [o]rder requiring Defendants to transfer registration of the domain back to [Brad] so that he can make certain it has been appropriately shelved."

In his answer, Brian stated the pistotniklaw.com domain name was used in the commercial "by mistake" but was not used "in ongoing advertising." Brian admitted that "www.pistotniklaw.com [was] currently being used to redirect traffic to www.pistotniklawfirm.com and that started after the Kansas Supreme Court issued a decision suspending Brad Pistotnik's license" for one year. See *In re Pistotnik*, 316 Kan. 96, 108, 512 P.3d 729 (2022) (*Pistotnik II*). Brian claimed the settlement agreement was invalid, asserting among other defenses impossibility, illegality of subject matter, and equitable estoppel.

The case proceeded to a bench trial, where four witnesses testified: Charles Millsap, Brad's counsel during the action to dissolve AAPLO; Brian; Collignon; and Brad. At the end of the trial, the district court ruled in Brad's favor:

> "Having reviewed the case law, evidence, and testimony presented, it is the finding of the Court that its analysis is limited to the four corners of the [settlement agreement] document. As such, the Court finds that pursuant to the contract, the domain, pistotniklaw.com was to be dismantled and permanently inactivated. All named parties in the current lawsuit, signed and agreed to the contract at issue. Therefore, they are bound by the contract.
>
> "The defendants['] argument, that they should not be bound by the contract, fails because the receivership continued for years beyond the execution of the contract. Receivership was beyond the control of the parties and does not impact the validity. The appellate court found it is solely within the discretion of the trial court to keep the receivership in place.
>
> "The parties are to designate a third party to dismantle and inactivate the domain, pistotniklaw.com, within three months of this order and plaintiff will pay yearly fees to keep it inactive."

Brian filed a motion for reconsideration and for clarification, which the district court denied. Brian now appeals. Additional facts will be included where necessary.

ACQUIESCENCE DOES NOT BAR OUR CONSIDERATION OF THIS APPEAL

We must first address whether Brian has waived his right to appeal by acquiescing to the district court's judgment. Brad raises acquiescence for the first time on appeal, and Brian does not address the issue in his brief. However, subject matter jurisdiction can be raised at any time, including on appeal. *Baker v. Hayden*, 313 Kan. 667, 673, 490 P.3d 1164 (2021). And because acquiescence implicates jurisdiction, we have previously stated acquiescence can be raised for the first time on appeal. *Tharrett v. Everett*, No.

125,999, 2024 WL 1954298, at *4 (Kan. App.) (unpublished opinion), *rev. granted* 319 Kan. 836 (2024).

Because acquiescence involves jurisdiction, whether a party acquiesced to a judgment is a question of law subject to unlimited review. *Alliance Mortgage Co. v. Pastine*, 281 Kan. 1266, 1271, 136 P.3d 457 (2006).

Acquiescence to a judgment—which cuts off the right of appellate review—"occurs when a party voluntarily complies with a judgment by assuming the burdens or accepting the benefits of the judgment contested on appeal. A party that voluntarily complies with a judgment should not be permitted to pursue an inconsistent position by appealing from that judgment. [Citations omitted.]" 281 Kan. at 1271. If a judgment involves separate and distinct matters, accepting the burdens or benefits of one part thereof will not prevent an appeal as to the remaining contested parts of the judgment. *Huet-Vaughn v. Board of Healing Arts*, 267 Kan. 144, 147, 978 P.2d 896 (1999).

*Facts Underlying the Acquiescence Claim*

At trial, the parties conveyed to the district court that if no one maintained the pistotniklaw.com domain name registration, anyone could then register the pistotniklaw.com domain name and use it. To avoid this, in its 2023 trial ruling, the district court ordered:  "The parties are to designate a third party to dismantle and inactivate the domain, pistotniklaw.com, within three months of this order and plaintiff [Brad] will pay [the] yearly fees to keep it inactive."

In his motion for reconsideration and clarification, Brian stated he "voluntarily took down the [pistotniklaw.com] website." After the district court denied Brian's motion for reconsideration, Brian requested payment from Brad for the annual renewal fee of $21.99 to maintain the pistotniklaw.com domain. Thereafter, Brian filed with the district

court a document stating that Brad had paid him for "the pending renewal of pistotniklaw.com, as directed by the Court's June 5, 2023 . . . Ruling."

*Acquiescence*

Brad argues that because Brian demanded Brad pay for the yearly fee to keep the domain name inactive pursuant to the district court's ruling, Brian acquiesced to the judgment and lost his right to appeal. Again, Brian did not respond to this argument.

Although Brian did accept the benefit of the district court's ruling by having Brad pay the $22 fee rather than paying it from his own pocket, we cannot say this alone amounts to acquiescence which bars our jurisdiction. First, Brian had already agreed to take down the website, so the only benefit he accepted was Brad's payment of the registration fee, which was a nominal amount, and which Brian had apparently been paying for the past decade. And, keeping the domain inactive protects all parties from any third party using the domain while their legal actions remain pending. See *Alliance Mortgage Co.*, 281 Kan. at 1271 (citing *Bank IV Wichita v. Plein*, 250 Kan. 701, 709, 830 P.2d 29 (1992) (discussing that an appeal otherwise barred by an appellant's acquiescence in the judgment may be permissible in specific circumstances, including when a protective measure is taken to protect a party's rights while an appeal is pending).

Based on the particular facts of this case, we find it appropriate to apply the protective measure exception, and Brian's acquiescence will not bar the appeal of the district court's judgment.

THE DISTRICT COURT DID NOT ERR IN FAILING TO INVALIDATE
THE SETTLEMENT AGREEMENT AS IMPOSSIBLE TO PERFORM

At trial, Brian and PLO argued that the settlement agreement was invalid for numerous reasons. Collignon filed a separate trial brief presenting his own arguments—

essentially, that PLO as a limited liability corporation had obligations under the settlement agreement, but Collignon personally had no "[d]omain related obligations" and so Brad had no legally supported claims against Collignon. And, even if Brad had a claim, Collignon argued the agreement was unenforceable due in part to Brad's suspension from law practice and impossibility. The district court found it had no jurisdiction to consider the settlement agreement's validity because the settlement agreement was enforced during the prior litigation and the appeal time to challenge the agreement's validity had run. Whether the district court erred by failing to invalidate the settlement agreement as impossible to perform is properly preserved for appeal.

An appellate court exercises unlimited review over the interpretation and legal effect of written instruments and is not bound by the district court's interpretations or rulings. *Trear v. Chamberlain*, 308 Kan. 932, 936, 425 P.3d 297 (2018). "Whether a party should be excused from its obligations under a written agreement because of impracticability of performance is a question of law." *T.S.I. Holdings, Inc. v. Jenkins*, 260 Kan. 703, 716, 924 P.2d 1239 (1996).

*First, Res Judicata*

Before we reach the issue of impossibility, Brad argues that because Brian did not challenge the settlement agreement's validity in his previous appeal, he is prevented from doing so now by res judicata. Appellants filed no reply to challenge this res judicata argument.

Whether res judicata applies is a question of law subject to unlimited review. *Herington v. City of Wichita*, 314 Kan. 447, 450, 500 P.3d 1168 (2021).

Before res judicata will prevent a successive action from proceeding, four requirements must be met:  (1) same claim; (2) same parties; (3) claims were or could

9

have been raised previously; and (4) a prior final judgment on the merits. *Cain v. Jacox*, 302 Kan. 431, 434, 354 P.3d 1196 (2015).

We first consider whether our current case involves the same parties. In Brian's prior appeal, only he, AAPLO, and PLO were the appellants, so for res judicata purposes, Brian and PLO are clearly the same parties as in the present appeal. But Collignon was not listed personally as an appellant in the prior appeal. See *Pistotnik I*, 2017 WL 2210776. Nor was Collignon listed personally in the district court's 2020 order terminating the receivership, where the district court stated it was terminating the receivership based on the validity of the settlement agreement.

But Collignon is a member of PLO, he pursued a claim in the receivership action to dissolve AAPLO, and was a signatory to the settlement agreement that formed the basis of the prior lawsuit. During oral argument on this appeal, Brad seemed to argue that these facts give Collignon a sort of privity with Brian and PLO through which Collignon should also be prohibited by res judicata from pursuing any claims of impossibility. But Brad provided no legal support for his position, and failure to support a point with pertinent authority is like failing to brief the issue, and issues not adequately briefed are deemed waived or abandoned. *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018); see *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018).

"Privity means a mutual or successive relationship to the same legal rights." *Penachio v. Walker*, 207 Kan. 54, 58, 483 P.2d 1119 (1971). "'Privity has been held to exist in the following relationships: concurrent relationship to the same property right (i.e. trustee and beneficiary); successive relationship to the same property or right (i.e. seller and buyer); or representation of the interests of the same person. [Citation omitted.]'" *Midwest Crane & Rigging v. Schneider*, No. 113,725, 2016 WL 1391805, at *6 (Kan. App. 2016) (unpublished opinion) (quoting *Lowell Staats Min. Co. v. Philadelphia Elec. Co.*, 878 F.2d 1271, 1275 [10th Cir. 1989]). In *Midwest Crane*, our

10

court analyzed an employee-employer relationship and found that as employee agents acting in furtherance of the employer corporation's interests, rather than their own, in the events giving rise to the litigation, the employees remained in privity with the employer for the purposes of res judicata. *Midwest Crane & Rigging*, 2016 WL 1391805, at *7.

But here, we have a minority member of a limited liability company, acting on his own, making discrete arguments, while his majority member partner and the LLC act together—without him—in separate filings. Under these facts, and without any legal support from Brad as to how privity may be established, we do not invoke privity on Collignon here to apply res judicata against him.

As to Brian and PLO, though, res judicata does apply to bar any claims that the settlement agreement is invalid as impossible to perform. Brian and PLO, through the earlier lawsuit, had the opportunity to contest the validity of the settlement agreement. Brian could have challenged the settlement agreement's validity when Brad asked the district court to require Brian to execute the agreement. The conditions creating any impossibility of performance already existed during the prior proceedings. Instead, in the previous action, Brian argued the district court should have followed the settlement agreement by closing the receivership sooner. As a result, any challenge to the validity of the settlement agreement is now barred by res judicata. As our court has explained, Brian and PLO are now barred from challenging the agreement's validity when they had prior opportunities to do so. See *Johnson v. Johnson*, 26 Kan. App. 2d 321, 328, 988 P.2d 244 (1999) (because lack of consideration for the family settlement agreement was a waivable affirmative defense and it was not raised in the first lawsuit, the court concluded the parents were precluded from raising the issue in a subsequent lawsuit).

Other panels of this court have found similarly. See *Alfani v. Kansas Dept. of SRS*, No. 100,770, 2009 WL 1591744, at *3 (Kan. App. 2009) (unpublished opinion) (finding because Alfani could have raised the debt's validity during his initial challenge to

11

collection of the judgment, rather than in his second lawsuit claiming negligence and statutory violations during the collection efforts, any claim on validity was barred by res judicata); see also *Hand v. Liberty Asset Management*, No. 100,710, 2010 WL 445688, at *4 (Kan. App. 2010) (unpublished opinion) (finding a challenge to the validity of a foreclosure barred by res judicata for failure to appeal the district court's order confirming the foreclosure sale).

As described, proceedings on the merits occurred when the district court terminated the receivership in July 2020. In its order closing the receivership, the district court found there was "no motion nor request before this Court to set aside that 2015 settlement agreement or to find that it is invalid." The court stated it "approved the termination of the receivership . . . based on the existence *and validity* of the 2015 [S]ettlement [A]greement." (Emphasis added.) Neither Brian nor PLO appealed from this order.

Likewise, because Brian and PLO failed to raise the issue in their first appeal, and they failed to appeal the district court's order closing the receivership based on the settlement agreement's validity, these failures now bar, through res judicata, their pursuit of their claim that the settlement agreement is invalid as impossible to perform.

*Back to Impossibility of Performance*

We must still address Collignon's claim that the settlement agreement was impossible to perform. Kansas courts have used the terms impossibility and impracticability interchangeably to describe when a party is unable to perform a contract. *T.S.I. Holdings*, 260 Kan. at 715.

Our Supreme Court has recognized a "distinction between subjective ('I cannot do it') and objective ('the thing cannot be done') impracticability." 260 Kan. at 716. "Only

12

objective impracticability may serve to relieve a party of a contractual obligation. The impracticability that may excuse performance must exist: (1) in the nature of the thing to be done; and (2) when the 'thing to be done' cannot be done by anyone. [Citations omitted.]" 260 Kan. at 716.

The Restatement (Second) of Contracts § 266 (1981) recognizes two scenarios where a party may be excused from performance on impossibility or impracticability, both of which hinge on a fact of which the party has no reason to know:

> "(1) Where, at the time a contract is made, a party's performance under it is impracticable without his fault because of a fact of which he has no reason to know and the non-existence of which is a basic assumption on which the contract is made, no duty to render that performance arises, unless the language or circumstances indicate the contrary.
> "(2) Where, at the time a contract is made, a party's principal purpose is substantially frustrated without his fault by a fact of which he has no reason to know and the non-existence of which is a basic assumption on which the contract is made, no duty of that party to render performance arises, unless the language or circumstances indicate the contrary."

In *Sunflower Elec. Coop., Inc. v. Tomlinson Oil Co.*, 7 Kan. App. 2d 131, 138, 638 P.2d 963 (1981), another panel of this court recognized three conditions for excusing a party from performance if objective impracticability exists: "(1) [T]he impracticability must not have been caused by the promisor (fault)[;] (2) the promisor must have had no reason to know of the impracticability (foreseeability); and (3) the language or circumstances may indicate that the promisor not be relieved because of the impracticability (assumption of the risk)." Therefore, this court has stated: "Where there is objective impossibility of performance, a breach of contract is excused unless the impossibility was foreseeable and might have been provided against in the contract." *Family Dollar Stores of Kansas, Inc. v. Christie*, No. 75,353, 1997 WL 35435229, at *1 (Kan. App. 1997) (unpublished opinion).

Collignon argues that because the parties could not control the district court's oversight of the receivership, the agreement to close the receivership as soon as practicable was impossible to perform. He claims the court's ruling in *Pistotnik I* that the district court had discretion to keep the receivership open rendered the settlement agreement impossible to perform. Collignon submits this impossibility rendered the entire settlement agreement void.

But as our court in *Pistotnik I* explained, and as legal professionals would be well aware, "the receiver serves at the discretion of the court. The receivership may continue 'as long as the court shall think necessary' to do all acts that might be done by the corporation necessary for the final settlement of unfinished business of the corporation." 2017 WL 2210776, at *5; see K.S.A. 17-6808. So, the closure of a receivership depends on the district court's determination of whether the receivership is needed.

The Restatement (Second) of Contracts § 264 (1981) discusses compliance with a governmental authority as a basis for impossibility: "If the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made." However, a discharge from the duty to perform is not absolute:

> "With the trend toward greater governmental regulation, however, parties are increasingly aware of such risks, and a party may undertake a duty that is not discharged by such supervening governmental actions, as where governmental approval is required for his performance and he assumes the risk that approval will be denied." Restatement (Second) of Contracts § 264, comment a (1981).

Our court has previously considered whether impossibility applies where a contract term requires the approval of a government authority. In *Wichita Properties v. Lanterman*, 6 Kan. App. 2d 656, 633 P.2d 1154 (1981), Lanterman entered a lease stating

14

the premises would be used solely to operate a liquor store. After taking possession, Lanterman informed Wichita Properties that he was unable to obtain a liquor license. Upon failing to find someone else to operate the liquor store, Lanterman told Wichita Properties he would not perform the lease. In a suit for breach, the district court found Lanterman liable for unpaid rent. Lanterman argued that his inability to obtain a liquor license excused his nonperformance.

This court in *Wichita Properties* found Lanterman knew he had to obtain a liquor license and "should have provided in the contract for such contingency." 6 Kan. App. 2d at 664. It concluded that other jurisdictions "generally" considered impossibility inapplicable under these circumstances and found Lanterman failed to establish "facts making the inability to obtain a liquor license unforeseeable." See 6 Kan. App. 2d at 664.

Consistent with *Wichita Properties*, there is no evidence in this case that the parties were unaware they would need the district court's approval to close the receivership. The law is clear that a receivership "may be continued as long as the court shall think necessary[.]" K.S.A. 17-6808. Thus, it was reasonably foreseeable that the district court could deny a request to terminate the receivership, and the parties could have provided for such a possibility in the settlement agreement. This would be particularly so in this case, where all parties to the settlement agreement were lawyers/legal entities. For these reasons, we find Collignon's impossibility argument unpersuasive.

### THE DISTRICT COURT DID NOT ERR IN FAILING TO INVALIDATE THE SETTLEMENT AGREEMENT AS ILLEGAL

Next, Appellants argue the settlement agreement was illegal and the district court erred by refusing to invalidate it. They contend it was contrary to law for the parties to

15

contract as to what action the district court would take with the receivership, since the parties had no control over the district court.

At the outset, we may quickly dispense with any claims by Brian and PLO regarding the alleged illegality of the settlement agreement. As examined thoroughly in the previous section, res judicata applies to bar any claims by these parties that the settlement agreement is invalid as illegal. The conditions creating any illegality existed during the previous litigation, and these parties had the opportunity to raise this claim and did not. The elements of res judicata are met, and their claim of illegality in the present action is barred. See *Johnson*, 26 Kan. App. 2d at 328.

As for any claims of illegality by Collignon, his claim fails on preservation grounds. It is a well-established legal maxim that issues not raised before the district court cannot be raised on appeal. See *In re N.E.*, 316 Kan. 391, 407, 516 P.3d 586 (2022). There are exceptions to this general rule; however, Supreme Court Rule 6.02(a)(5) (2024 Kan. S. Ct. R. at 36) requires an appellant to explain why an issue that was not raised below should be considered for the first time on appeal. Our Kansas Supreme Court has repeatedly warned litigants that Supreme Court Rule 6.02(a)(5) would be strictly enforced, and litigants who failed to comply risked a ruling that the issue was improperly briefed and would be deemed waived or abandoned. See *State v. Holley*, 315 Kan. 512, 524, 509 P.3d 542 (2022).

Before the district court, Collignon filed a trial brief separately from Brian. In that brief, his arguments were: (1) The settlement agreement should be enforced, and in doing so, there was no supportable claim by Brad against Collignon specifically; (2) if there were a supportable claim against Collignon, the agreement was unenforceable as unconscionable because Brad's law license was suspended; and (3) the agreement was void because it was impossible to perform due to the agreement that the receivership be closed as soon as possible. Collignon made no argument to the district court regarding the

16

alleged illegality of the settlement agreement, and he makes no effort to explain to this court why we should consider this new issue now. We decline to do so.

Again, we find the district court did not err by declining to invalidate the parties' settlement agreement, even if the court utilized different reasoning. See *State v. Parks*, 312 Kan. 487, 489, 476 P.3d 794 (2020) ("Appellate courts may affirm a district court as right for the wrong reason 'if an alternative basis exists for the district court's ruling.'").

THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING EQUITABLE ESTOPPEL INAPPLICABLE TO BRAD'S CLAIM REGARDING THE DOMAIN NAME

At trial, Brian argued that Brad was equitably estopped from challenging Brian's use of the domain name due to Brad's misrepresentations and failure to challenge Brian's ownership and control of the domain. In its trial ruling, the district court did not explicitly rule on Brian's estoppel argument. Then, at the hearing on Brian's motion for reconsideration and clarification, Brian brought the court's silence on estoppel to the district court's attention. The district judge responded, "I don't feel that equitable estoppel applies in this case. I'm not going to find that . . . it is a remedy . . . in this case." Brian preserved the issue for appeal.

We generally apply an abuse of discretion standard when reviewing a district court's application of equitable estoppel. *In re Estate of Pritchard*, 37 Kan. App. 2d 260, 279, 154 P.3d 24 (2007). A district court abuses its discretion if (1) its decision is arbitrary, fanciful, or unreasonable; (2) its decision is based on a legal error; or (3) its decision is based on a factual error. *In re Spradling*, 315 Kan. 552, 590, 509 P.3d 483 (2022). The party asserting abuse of discretion has the burden to show such an abuse. *Bicknell v. Kansas Dept. of Revenue*, 315 Kan. 451, 466, 509 P.3d 1211 (2022).

17

*Examination of Equitable Estoppel*

Our Supreme Court has explained equitable estoppel as follows:

> "'Equitable estoppel is the effect of the voluntary conduct of a person whereby he is precluded, both at law and in equity, from asserting rights against another person relying on such conduct. A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. [Citations omitted.]'" *Steckline Communications, Inc. v. Journal Broadcast Group of KS, Inc.*, 305 Kan. 761, 769, 388 P.3d 84 (2017).

"The policy underlying equitable estoppel is that 'it would be unconscionable to allow a person to maintain a position inconsistent with one in which he or she accepted a benefit.'" 305 Kan. at 770. When a party claims estoppel based on another party's silence, the party claiming estoppel must prove that the other party had a duty to speak and that, by remaining silent, they "had an intent to deceive or a reason to believe others would be deceived in detrimentally relying on that silence." *Fawcett Trust v. Oil Producers Inc. of Kansas*, 315 Kan. 259, 292, 507 P.3d 1124 (2022).

Brian claims Brad engaged in misrepresentations in two ways: first by contracting to close the receivership but then opposing closure of the receivership, and then by failing to contest Brian's ownership of the domain from the closure of the receivership in 2015 until 2022. Brian argues that he detrimentally relied on Brad's promise to close the receivership, and that PLO detrimentally relied on the yearly payments it made to GoDaddy for ownership and control of the domain. Brian contends that PLO is now disadvantaged by having to use a new domain—pistotniklawfirm.com—when the pistotniklaw.com domain name has existed since 1998 "and was the highest ranking website on Google for years." He also claims PLO is the only party disadvantaged

18

because it still uses "Pistotnik Law" in its marketing while Brad's new firm no longer uses the Pistotnik name.

Brad responds that the district court correctly rejected Brian's estoppel argument. Brad argues that Brian breached the settlement agreement by using the domain name in a commercial and now simply seeks to use estoppel to revise the settlement agreement.

1. *Res Judicata*

First, we address Brad's argument that the two misrepresentations claimed by Brian—Brad's promise to close the receivership and failure to challenge PLO's ownership of the domain—occurred before the appeal deadline in the prior litigation. As a result, Brad suggests Brian could have raised these issues in his first appeal and cannot raise them now.

Again, res judicata only prohibits a party from raising an issue if the party previously raised the issue or could have previously raised it. *Cain*, 302 Kan. at 434. Because Brad opposed closure of the receivership before Brian's first appeal—in fact, closure of the receivership was the basis for the prior litigation—Brian could have raised that issue in his first appeal or at any time prior to the closure of the receivership in 2020. So, claims that Brad engaged in misrepresentation by opposing the receivership are now barred by res judicata.

But on the failure to challenge ownership of the domain, Brad seems to conflate Brian's argument on estoppel with his arguments on the impossibility and illegality of the settlement agreement. Although the parties' first appeal occurred after PLO retained ownership of the domain, Brad does not show how Brian could have raised Brad's failure to challenge PLO's ownership in the first appeal. Brian could only have raised this issue if Brad had contested the use of the domain. But Brad did not raise any such challenge

19

until the present litigation ensued in 2022. In other words, res judicata does not apply here where the conditions under which Brian could have raised an estoppel argument based on Brad's failure to dispute PLO's ownership of the domain name did not previously exist. See *O'Neal v. City of Hutchinson*, No. 122,934, 2021 WL 5408630, at *5 (Kan. App. 2021) (unpublished opinion) (finding claimant could not have raised repetitive trauma claim in first workers compensation proceeding where evidence of repetitive trauma did not yet exist).

### 2. *Estoppel on Use of Domain*

To fully examine Brian's estoppel claim, we provide a bit more factual background. Brad created the domain name for AAPLO's website, pistotniklaw.com, in 1998, and AAPLO paid for it. In July 2014, during the lawsuit to dissolve AAPLO, the district court denied Brian's request to "[d]eclare that AAPLO [was] the owner of the domain name pistotniklaw.com" and to "[a]llow AAPLO and Brian Pistotnik to use the domain name pistotniklaw.com in future advertising." As noted above, because Brad had controlled the website for the month leading up to the court's order, the court gave Brian control over the website for an equal period, after which the court ordered the website to be reconfigured to contain links to both parties' new firms. The court also enjoined AAPLO from using "pistotniklaw.com" in any future advertising. The court made clear its intention that after each party had equal control over the website and links to each of their new law firm's websites established during the initial dissolution, pistotniklaw.com would "move on to individual websites."

On cross-examination at trial, Millsap—Brad's counsel during the 2014 litigation—acknowledged that after the court's ruling in 2014, Brian maintained control over the domain and paid the annual registration fees, although neither the parties nor the court apparently discussed the registration or ownership of the domain. Then in August 2022, Brad filed suit against Brian, Collignon, and PLO for breach of the settlement

20

agreement, citing PLO's use of the pistotniklaw.com domain name in a TV commercial. In his answer, Brian acknowledged its use in the commercial but claimed it was "by mistake."

At trial, Brad introduced deposition testimony by Collignon—who appeared in the commercial—that neither Collignon nor Brian saw the final commercial before it aired. Collignon was "surprised" that the pistotniklaw.com domain name appeared in the commercial, stating that "[i]t was rushed." In his deposition, Collignon testified that he and Brian told the TV network they wanted their firm's website included in the commercial instead of their phone number. Collignon believed the TV network listed the website as pistotniklaw.com in the commercial because that was the domain name listed in the firm's emails.

It is unclear exactly when the pistotniklaw.com website began redirecting to pistotniklawfirm.com. After learning that the domain name appeared in the commercial in February 2022, Collignon thought the pistotniklaw.com domain name was inactive and stated, "I Googled pistotniklaw.com, because I was kind of like, well, that sucks. We just ran an ad and it's going to a dead website. Wonderful." But upon searching for pistotniklaw.com, Collignon discovered that the website redirected to pistotniklawfirm.com.

On February 15, 2022, Millsap sent a demand letter to Brian and Collignon regarding the commercial and the "recent decision" to activate pistotniklaw.com and redirect its traffic to pistotniklawfirm.com. That same day, Collignon emailed Millsap, claiming pistotniklaw.com no longer redirected to pistotniklawfirm.com. But in the summer of 2022, Collignon discovered pistotniklaw.com was active again after receiving an email from Tony Atterbury, Brad's law partner. When Collignon discussed this reactivation with Brian, Brian said he reactivated the domain name after Brad's license was suspended because "a non-licensed attorney should not be able to dictate what

21

[Brian] does and that . . . Brad breached [the settlement agreement] a long time ago." In his answer to Brad's petition, Brian stated that pistotniklaw.com began redirecting traffic to his firm's website after Brad's law license was suspended in July 2022. At the time of trial in May 2023, pistotniklaw.com still redirected to pistotniklawfirm.com.

Collignon understood that Brian believed redirecting pistotniklaw.com to pistotniklawfirm.com gave the latter website "more credibility with Google or however they rank." Collignon agreed "that it would not make sense that the firm could use [the domain] if [Brian] has to kill it."

During the earlier dissolution proceedings in 2014, Brian filed a declaration claiming, "[t]he age of a URL greatly affects the ranking of [Google] search results." But at the 2023 bench trial before the district court in the current matter, Brian testified because Google changed its website ranking system, a URL's age "probably doesn't make that much of a difference anymore." Brian also testified that he or his firm had been paying the domain charges for pistotniklaw.com since the parties agreed to "kill it." At trial, Brad's counsel argued, and Brian did not disagree, that maintenance of the website's registration—and thus, payment of yearly activation fees—is necessary to keep the domain inactive to prevent a third party from utilizing the pistotniklaw.com domain. That is, maintenance of the domain's registration is required to prevent other competitors from accessing the potentially aged website whose age may, or may not, have value.

To succeed on his estoppel argument, Brian must show that Brad had a duty to speak regarding his control of the domain, and that Brian rightfully relied and acted upon Brad's silence. See *Steckline Communications*, 305 Kan. at 769. Having failed to challenge Brian's control during the years between the dissolution of AAPLO and 2022, Brian claims Brad is now estopped from challenging Brian's use of the domain. Brian contends he "detrimentally relied on [his] yearly payments to Go[D]addy for the ownership and possession rights" of the domain.

22

But Brian's argument fails to recognize a distinction between control over a domain name and use of that domain. The settlement agreement did not specify who could register and maintain the domain name. Instead, the settlement agreement clearly provided that "the domain name pistotniklaw.com shall be removed from the internet and *killed*, and the parties agree that nobody will use any of the content from that website in the future *for any purpose*." (Emphases added.) Although Brian argues he relied on Brad's silence to believe he controlled the domain, he makes no effort to show how Brad's silence led him to believe he could begin using the domain name in advertising and could reactivate the pistotniklaw.com website to redirect web traffic to pistotniklawfirm.com. Doing so is quite the opposite of the terms of the settlement agreement and the clear orders of the district court in 2014, and it is unclear how Brad's silence would have led Brian to decide his breach of the agreement and violation of the court order was appropriate.

Moreover, both Brian and Collignon claimed they were unaware that the domain name would appear in the TV commercial. If the domain name was mistakenly included, Brian cannot then claim to have accidentally included the domain name in the commercial because of any misrepresentation by Brad. An accident is not an action which occurred because of detrimental reliance.

Kansas courts have examined the duty to speak and reasonable reliance in the estoppel context. In *Rockers v. Kansas Turnpike Auth.*, 268 Kan. 110, 991 P.2d 889 (1999), Rockers claimed equitable estoppel barred the Kansas Turnpike Authority (KTA) from relying on the statute of limitations for a retaliatory discharge claim. After discovering the notice requirement in the Kansas Tort Claims Act, Rockers' counsel asked the KTA's counsel for the person to whom he should give notice rather than immediately filing a petition. The KTA, as a state authority, was not subject to the notice requirement, but the KTA's counsel did not inform Rockers' counsel of that fact. As a result, the statute of limitations expired on Rockers' retaliatory discharge claim.

23

Our Supreme Court rejected Rockers' estoppel argument. The court found that Rockers did not reasonably rely on the KTA's silence or other statements. The court explained: "The KTA had no duty to speak, it did not assert that notice was required, and it did not affirmatively mislead the attorney as to material knowledge held only by the KTA." 268 Kan. at 118. The court concluded that because Rockers "planned to file a notice of claim and merely contacted [the KTA] with regard to who should receive the notice," Rockers failed to show a change in position due to the KTA's silence. 268 Kan. at 119.

The principles outlined in *Rockers* apply here. In the settlement agreement, Brian agreed that the domain name would "be removed from the internet and killed" and that the website would not be used for any purpose. Even so, the record indicates that Brian decided, on his own, to reactivate pistotniklaw.com sometime before the commercial aired in February 2022. Prior to, and even after the airing of the commercial, the record suggests the other parties believed pistotniklaw.com was, and remained, inactive.

Brian is correct that Brad never challenged his control over the domain. However, Brian fails to show why Brad had a duty to speak regarding use of the domain name when Brian promised to kill the domain name, and the domain name had been inactive. There is no evidence that Brian consulted Brad in any way before using the domain, or that Brad should have known the domain was active. As in *Rockers*, Brian does not explain how Brad misled him regarding any material knowledge only Brad possessed. Furthermore, just as Rockers' counsel was not induced by the KTA's silence to give notice to the KTA, Brian cannot show how he was induced by Brad to believe he could use the domain. Again, use is different than control.

This court adjudicated an estoppel by silence claim in *Dunn v. Dunn*, 47 Kan. App. 2d 619, 281 P.3d 540 (2012). There, the Dunn family entered a settlement agreement replacing the fixed annuity required by Lynn Dunn's will with a variable

annuity. Lynn's surviving wife, Doris, and one of Lynn's children, Phillip, were the joint owners of the annuity. Although the family settlement agreement required it, Doris' securities broker changed the annuity's investment allocations without Phillip's signature, and Doris then cashed in the annuity. Lincoln National did not seek Phillip's consent before issuing payment and terminating the annuity and never sent Phillip notice of the termination, or any statements or correspondence for the life of the annuity. Lynn's children then sued for breach of the annuity contract. The children claimed estoppel by silence barred Lincoln National from relying on a statute of limitations defense, arguing that Lincoln National failed to send periodic reports to Phillip as required by the contract and failed to notify Phillip when Doris cashed in the annuity. 47 Kan. App. 2d at 628.

The *Dunn* court found the children's estoppel argument unpersuasive. Regarding the periodic reports, the court determined that Phillip would not have sued earlier had Lincoln National provided the reports, because Lincoln National's failure to provide its first periodic report in the first year of the contract put Phillip on notice the company had breached its contract, yet he did nothing. 47 Kan. App. 2d at 640. On the annuity cashout, the court concluded the children failed to identify a contractual duty for Lincoln National to notify Phillip that Doris had cashed out. 47 Kan. App. 2d at 640-41.

As in *Dunn*, here Brian has not shown that he would have acted differently had Brad spoken earlier about his use of the domain. In fact, the record shows that even after Brad challenged Brian's use of the domain name in the February 2022 commercial, Brian still reactivated the domain name again in July 2022 after Brad's law license was suspended. Additionally, as in *Dunn*, Brian fails to identify anywhere in the parties' settlement agreement which would have required Brad to speak regarding Brian's use of the domain name; Brian merely alleges a duty to speak regarding his control over the domain, which is likewise not found within the settlement agreement. And as *Dunn* makes clear, caselaw "teache[s] us that [Brad] must have intended to deceive [Brian] or at least harbored a willingness that [Brian] would rely upon and be deceived by [his]

25

silence." 47 Kan. App. 2d at 641. Like the court in *Dunn*, we find no support for that idea in this record.

Finally, it is completely unclear how Brian detrimentally relied on the yearly payments he made to GoDaddy for the registration of the domain in a way that justifies his use of the domain which was specifically prohibited in the settlement agreement and by court order. While it is true that Brad must have known that payment of the registration fee was occurring to keep the domain name unavailable to third party access, this simply means that the registration fee kept any other person or law firm from utilizing the website for themselves. Brian makes no effort to explain how he relied on his payment of the registration fee or how that reliance caused him to reactivate the domain.

Brian has not shown that Brad had a duty to speak, whether in the settlement agreement or otherwise, on which he reasonably relied, or that Brad intended to deceive him with his silence. We find no detrimental reliance, and thus no equitable estoppel, under these facts, and the district court did not abuse its discretion in finding the remedy inapplicable.

THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING EQUITABLE ESTOPPEL INAPPLICABLE TO BRAD'S CLAIM REGARDING EMAIL ADDRESSES

To dovetail his previous argument, in his motion for reconsideration and clarification after trial, Brian asserted that Brad was estopped from challenging his use of pistotniklaw.com in his firm's email address. During the motion hearing, the district court found estoppel inapplicable and ruled that the pistotniklaw.com email addresses could no longer be used. This issue is preserved for appeal, and as noted above, a district court's application of equitable estoppel is reviewed for abuse of discretion. *Pritchard*, 37 Kan. App. 2d at 279.

26

Additional context is helpful for this topic. As discussed at length, the parties' 2015 settlement agreement required that the domain name would "be removed from the internet and killed" but did not explicitly mention email addresses. After the settlement agreement was executed, as early as January 2016, Brian made several court filings containing his pistotniklaw.com email address and Brad also filed several documents listing Brian's pistotniklaw.com email address under the certificate of service. Millsap exchanged several emails with Brian and Collignon while Brian and Collignon were using their pistotniklaw.com email addresses, dating from 2020 to 2022. Although Brad challenged Brian's use of the domain name in the commercial in 2022, and in redirecting traffic to pistotniklawfirm.com, Brad did not specifically contest the use of the pistotniklaw.com email addresses at any point before or during trial.

After the district court issued its trial ruling requiring that the domain name be deactivated within three months, Brian requested clarification based on Brad's posttrial assertion that, in addition to deactivating the domain, Brian and his firm must change their email addresses to something other than pistotniklaw.com. Brian claimed Brad was estopped from challenging the email addresses based on his failure to prevent Brian from using the email addresses in the years since entering the settlement agreement. Brad responded that Brian's estoppel argument rested on a statute of limitations claim, which had been waived. Brad also argued that the pistotniklaw.com email addresses simply would no longer operate if the domain name was deactivated.

At the hearing on Brian's motion for reconsideration and clarification, the district court ruled that Brian had three months to change his firm's pistotniklaw.com email addresses as well as deactivate the domain. The judge agreed with Brad's argument that the email addresses were included in the domain:

"MR. HAZLEWOOD:  Okay. And then the domain has a component, one component is the URL, which is for websites. The other component is MX records,

27

which is mail, and there are other components for file servers and things like that. A domain is larger than just the URL. I think that is the confusion. The domain is what was bargained for to be dismantled and that is what we are asking for.

"THE [JUDGE]:  So their email should be fine.

"MR. HAZLEWOOD:  No.

"THE [JUDGE]:  So I don't understand.

"MR. HAZLEWOOD:  Email is a component of the domain. Web URLs are a component of the domain. Domain is the larger thing. The domain was what was to be dismantled.

"THE [JUDGE]:  Okay. So I am not getting rid of—you guys did not ask me to get rid of pistotniklawfirm.com.

"MR. HAZLEWOOD:  No. No.

"MR. BRIAN PISTOTNIK:  Your Honor, they never asked you to get rid of our email addresses either.

"THE [JUDGE]:  Okay, but that's part of the domain name. If you could have it separate and then that is—

"MR. BRIAN PISTOTNIK:  Your Honor, that is how it has been since 2014.

"THE [JUDGE]:  I understand, but that's why we are here is because they were disputing the fact that you still have the domain that was referring it to your emails and referring it to your law firm. That is going to be gone."

Brian seems to frame his argument on the email addresses as two issues. First, he contends it was improper for the district court to grant relief to Brad on the use of the email addresses when Brad never requested that relief in the pleadings, the pretrial order, or at trial. Second, he argues Brad should be estopped from challenging the use of the email addresses due to his silence on the issue from 2015—when they entered the settlement agreement—to 2023—the end of trial. But from a technical standpoint, Brian also claims the district court did not understand that the website of www.pistotniklaw.com could be shelved, or deactivated, without affecting his or his staff's ongoing use of the email addresses.

28

In response, Brad also makes a technical argument—that Brian erroneously assumes "that a domain name and a website are interchangeable concepts." But Brad maintains that "[a]n email address like 'user@example.com' depends entirely on the operational status of the domain 'example.com.' Disabling the domain, as ordered by the court, disrupts the ability of any email services tied to that domain to send or receive emails."

*Domains, Websites, and Email Addresses*

Before we can directly address Brian's legal arguments, we first attempt to flesh out the parties' technical disagreements regarding the relationship between the domain and the email addresses, and whether the email addresses can function independently of the domain. Neither party provides us with authority to settle these disputes.

Brad appears correct that a domain name and a website are distinct concepts. A domain name is essentially the tool to locate an internet website. Smith, 1 Internet Law and Practice § 13:10 (2024 ed.). Domain names translate into a string of numbers that form a URL (Uniform Resource Locator) to access a website. A website, then, is a collection of web pages that can be located and accessed using the domain. Vinnick, *A Primer, Guiding Your Clients down the Information Highway*, 51 No. 10 DRIFTD 57 (2009). Similarly, a domain name can be used for email services. For example, a person who registers the domain name 'example.com' can then use that domain name to establish an email address ending in @example.com. See McDonald, Reich, and Bain, *Intellectual Property and Privacy Issues on the Internet*, 79 J. Pat. and Trademark Off. Soc'y 31, 35 (1997).

At the time the pistotniklaw.com domain was established in 1998, it was both part of the firm's email addresses, signifying that the users' particular accounts were on the

firm's network, and part of the URL used to find the law firm's website; for example, the firm's URL was http://www.pistotniklawcom.

Brad's position that use of the email addresses depends upon the operational status of the domain—if accurate—would dispose of Brian's contentions, but Brad does not support his argument with authority. Likewise, Brian's argument that the email addresses could be used separately from an inoperative domain is unsupported by any evidence or authority. As the party bringing the claim, it is his burden to designate a record sufficient to present his points to this court and to establish his claim. *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644, 294 P.3d 287 (2013); Supreme Court Rule 6.02(a)(4) (2024 Kan. S. Ct. R. at 36). Here, he fails to do so, and we are unable to decide his claim on the technical aspects he presents.

*Pretrial Order Did Not Mention Email Addresses*

In his first legal argument, Brian is correct that "[g]enerally, a trial court should not entertain an issue or claim that is omitted from the pretrial order. Rather, the pretrial order controls the course of the action unless modified to prevent manifest injustice." *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 708, 317 P.3d 70 (2014). This rule arises from K.S.A. 60-216(d)-(e):

> "(d) *Pretrial orders*. After any conference held under this section, the court should issue an order reciting the action taken. This order controls the subsequent course of the action unless the court modifies it.
> "(e) *Final pretrial conference and orders*. In any action, the court must on the request of any party, or may without a request, conduct a final pretrial conference in accordance with procedures established by rule of the supreme court. The court may modify the order issued after a final pretrial conference only to prevent manifest injustice."

30

Accordingly, courts attach significance to the pretrial order, its purpose being "'to eliminate the element of surprise from trials and to simplify the issues and procedure by full disclosure to all parties of the anticipated evidence and factual and legal issues and to consider "[s]uch other matters as may aid in the disposition of the action."'" 298 Kan. at 708.

In this case, the pretrial order listed one of the issues to be decided at trial as "[w]hether the defendants, or any of them, have failed or refused to comply with the settlement agreement by making post-settlement use of the pistotniklaw.com domain." In relevant part, the order described Brad's theory of recovery as follows:

> "In the second sentence of paragraph 28 of the contract, Brian Pistotnik agreed that the domain would no longer be used for any purpose (the 'promise'). All Defendants had knowledge of and/or consented to, that promise. Notwithstanding the promise, Defendants have used and/or are using the domain in advertising.

> "Plaintiff has requested that Defendants cease and desist from all further use of the domain. However, Brian Pistotnik and Pistotnik Law Offices, LLC have failed and refused, and still fail and refuse, to discontinue use of the domain.

> "By their conduct herein, Defendants have breached, are breaching, and/or have caused, facilitated, and/or participated in a breach of the promise and the contract."

The pretrial order did not mention the use of the pistotniklaw.com email addresses, nor did Brad make any such allegations in his petition. The email addresses were mentioned for the first time after trial.

During the posttrial proceedings, Brad did not provide a clear reason why he did not raise the issue at any point before or during trial, nor at the hearing on Brian's motion for reconsideration and clarification did the district court acknowledge the general rule

that parties cannot raise issues that were not included in the pretrial order or addressed at trial. Had Brad previously claimed use of the email addresses violated the settlement agreement, Brian may have had the opportunity to present a statute of limitations defense to that claim. See K.S.A. 60-511(1).

At the same time, from the outset of the present litigation, Brad requested that control of the pistotniklaw.com *domain* be transferred to him. Additionally, proper uses of the pistotniklaw.com domain name became a larger issue when the district court ordered that the domain name be dismantled. As outlined previously, an email address is one significant and well-known use for a domain name. For these reasons, we cannot say the district court's decision to address the email address issue as part of the domain name issue was not one with which no reasonable person would agree. We find no abuse of discretion in the district court's decision.

*Estoppel for Email Addresses*

Brian's central claim is that he should be able to use his pistotniklaw.com email address based on Brad's failure to ask him to stop using it. Brian essentially restates his equitable estoppel argument from the previous section, reasoning that because Brad never asked him or his new firm to stop using the "pistotniklaw.com" email addresses between 2015 and 2023, his silence on the issue should equitably estop him from now having his claim granted.

Given the understood relationship between the email addresses and the domain, and that the facts of the settlement agreement and the underlying facts of the parties' relationships are the same, our analysis of the equitable estoppel claim on the email addresses does not deviate significantly from our analysis above. We do acknowledge that Brian and his firm had used the pistotniklaw.com email addresses prior to the

32

settlement agreement and openly continued using the same email addresses for the next eight years following the agreement.

During that eight-year period, Millsap and Brian exchanged emails and both sides made several court filings containing the pistotniklaw.com email addresses. Accordingly, Brad and his counsel understood Brian was still using the email addresses associated with the domain, yet did not claim that the email addresses ran afoul of the settlement agreement until after the trial in 2023. On this basis, it does appear Brad had a duty to speak and, to some degree, induced Brian to believe that the pistotniklaw.com email addresses were permissible under the parties' agreement.

Even so, Brian has not demonstrated that Brad somehow intended to deceive him about the email addresses or mislead him with his silence. Moreover, Brian and his firm have already changed their email addresses to a different domain name to comply with the district court's order. As a result, whether we consider the new email addresses to demonstrate a lack of prejudice under Brian's estoppel theory, or as a bar to his claim under an acquiescence theory, in either case, Brian's claim lacks persuasion. But without demonstrating how he is prejudiced, or showing Brad intended to deceive him, Brian's estoppel argument fails, and the district court did not abuse its discretion in finding the remedy inapplicable.

Affirmed.

33